PEOPLE v. JONES.

1. INTOXICATING LIQUORS—ILLEGAL SALE—EVIDENCE—IDENTIFIED BOTTLE CONTAINING LIQUOR SOLD ADMISSIBLE.

In a prosecution for the illegal sale of a pint of moonshine whisky, the bottle in which the liquor was sold was properly admitted in evidence after the officer had testified that he found it the next morning where the purchasers indicated they had thrown it, and it was identified by them as the one they had bought or one which looked just like it.[1]

2. SAME—TESTIMONY AS TO ODOR OF BOTTLE ADMISSIBLE.

Testimony by the officer that he smelled the bottle, and that the odor made manifest that it had recently contained moonshine, was properly admitted; its weight being for the jury.[2]

3. WITNESSES—DEFENDANT'S COUNSEL MAY NOT CONTRADICT ALIBI WITNESS.

The trial court was justified in sustaining objection to testimony by defendant's counsel that an alibi witness for defendant had made statements contradictory to his testimony as to the time defendant was at witness' home, especially where said testimony was not very important on the issue of alibi.[3]

4. APPEAL AND ERROR—CROSS-EXAMINATION—ASKING UNANSWERED QUESTION NOT REVERSIBLE ERROR.

Asking defendant, charged with illegal sale of liquor, on cross-examination, as to whether the man who was on his bond had a case in the Supreme Court on a liquor charge, where not insisted on or answered, while unwise and perhaps objectionable, was not, under the circumstances, reversible error.[4]

5. WITNESSES—SCOPE OF CROSS-EXAMINATION IN DISCRETION OF COURT.

The scope of cross-examination during the progress of

[1]Criminal Law, 16 C. J. § 1229; [2]Intoxicating Liquors, 33 C. J. § 526; [3]Witnesses, 40 Cyc. p. 2768; [4]Appeal and Error, 4 C. J. § 2938.

trials is necessarily largely in the discretion of the trial court.[5]

Exceptions before judgment from Muskegon; Vanderwerp (John), J.    Submitted January 14, 1926. (Docket No. 143.)    Decided January 28, 1926.

Fred Jones was convicted of violating the liquor law. Affirmed.

*Wetmore & Bagley,* for appellant.

*Andrew B. Dougherty,* Attorney General, *R. Glen Dunn,* Prosecuting Attorney, and *Robert H. Dunn,* Assistant Prosecuting Attorney, for the people.

STEERE, J.    Defendant was convicted in the circuit court of Muskegon county of having, on the evening of April 15, 1925, unlawfully sold to one Edward White a pint of moonshine whisky.    The prosecution introduced testimony showing that on the night of April 15, 1925, police officers found four boys in the streets of Muskegon Heights in an intoxicated condition and took them into custody.    One of them was a colored boy named Edward White, who gave his age as 18 years.    The names and ages of the three white boys with him were, Paul Simonson aged 17 years, Norman Jones, 16 years, and Elmer Gould, 15 years.    Edward White was arrested for furnishing liquor to the other three boys, to which he pleaded guilty.    Coincident to that proceeding, defendant Fred Jones was arrested for selling to Edward White the whisky which the latter furnished to the other boys.    Jones' arrest was followed by a preliminary examination, as a result of which he was held for trial in the circuit court, where he stood mute when arraigned, and a plea of not guilty was entered in his behalf by the court, and trial by a jury followed.

[5]Witnesses, 40 Cyc. p. 2512.

Defendant Jones is a colored man living in the outskirts of Muskegon Heights with a white wife and child. The only significance of his family relations is in connection with his identification. He made total denial that he ever sold any liquor to any of these boys or had ever seen any of them to his knowledge, except Edward White, whom he said he had met a couple of times at church.

Upon the trial two policemen of Muskegon Heights and the four boys were called as witnesses for the prosecution. The story as told by the boys was in substance that late in the afternoon of that day they had casually forgathered at a restaurant and cigar store down town called "Molly's Place," where they spent some time in social intercourse, during which Ed. White incidentally suggested that they go out and "get some moonshine," which proposal met with unanimous approval, and, waiting until after nightfall, they fared forth in that quest under his guidance towards the easterly outskirts of the city, and paused near a house which White testified was defendant's home. Two of the boys waited in the vicinity while Ed. White and Norman Jones went up to the house, White leading the way, and, after certain preliminaries, they were admitted by the rear door, following which White bought from defendant a bottle of moonshine whisky for which he paid him $1.50. They then joined the others, when the four jointly and successfully proceeded to consume its contents, after which Elmer Gould threw the bottle into some nearby woods. Their trip back was less surreptitious and more eventful than their journey out, resulting in their falling into the hands of the police in an intoxicated condition.

Jones' defense was an *alibi* and total denial of all knowledge of any of the events which the boys related. He testified that he left home early that evening in his automobile for a ride of some 12 miles out in the

country, accompanied by his wife and child, and a man he called Slim who had helped him repair his car, that they went to the place of a fellow named Tony, where they stopped for some time and did not get home until after 12 o'clock. His wife and Slim testified to like effect.

Of the events at Jones' house that evening, Ed. White, who knew defendant Fred Jones, testified in part:

"Well, me and Norman Jones went into his house. We went to the front door first, knocked and he told us to come around back and we went around to the back and he opened the door and we asked him if we could get a pint of moonshine. He said he didn't have very much but he would divide with us what he did have. He said he was pretty sick and that he was just going to start, go away, and his wife went out of the house and then came back and he went in the bedroom and came out with a bottle full of moonshine. * * * No, it was a jar. He poured it into this thermos bottle, then he poured it into that there jar which Moore got. There was some left in the thermos bottle and I finished that and there was some in the glass and he drank that, then we put the cover on it and went outside. I bought it. It cost $1.50. I paid for it. Gave him one dollar and a fifty cent piece there in the house. A paper dollar. Then we went outside and we drank the whisky and throwed the bottle away."

Norman Jones, who accompanied White, testified in substance to like events, and identified Jones and his white wife in the court room as the parties who furnished the moonshine which White bought that evening. He also testified that when they went there Jones said he was just going out in the car with his wife.

In relating the next morning what he remembered of their previous night's adventures, Norman Jones told assistant chief of police Moore that he threw the "killed," or empty whisky bottle into the woods up

there, and when taken out there by the officer to see if he could locate it he indicated where he had thrown it off into the brush and they found the bottle there. It was identified by the boys as the bottle they had "killed" the night before, or one which looked just like it.    Officer Moore produced the bottle in court and identified it as the one they had found where Norman indicated.    He was allowed against objection to testify that he smelled of it and the odor made manifest that it had recently contained moonshine.    It was then admitted in evidence.    The ruling upon his testimony as to its odor and its admission in evidence, because not sufficiently identified, are urged as reversible error.    While, as applied to search warrants for dwellings, our legislature has seen fit to abolish odor from the five senses with which mankind is endowed as perceptive faculties for apprehension of objects or conditions either present or near, it has not yet otherwise prohibited the use of the sense of smell as well as taste in determining the nature and presence of intoxicating liquor, or proof of the fact so obtained by those qualified to testify to its recognized odor. The evidence upon both propositions was competent and its weight was for the jury.

In support of his claimed *alibi*, defendant's counsel called as a witness a young man named Tony Jackovitz, son of the so-called "Tony" at whose house, 12 miles out in the country, defendant claimed to be at the time the boys testified they bought the moonshine whisky from him at his home in the city.    Young Tony's command of English was manifestly quite limited, but he at first testified with satisfactory clarity that defendant, his wife and child and Slim were out at their house in the country on April 15th. Asked what time of the day it was he replied:

"Well, there about coming see our place 9 o'clock and later 10 o'clock, our place one hour.

"*Q.* You think it was in the morning or evening?

"*A.* In the morning."

Having committed himself as to the time those guests arrived and remained, he clung tenaciously to it, although defendant's counsel was allowed to catechise him on the subject as fully as he desired. Part of that examination ran as follows:

"*Q.* You told me it was 9 o'clock at night.

"*A.* Well, I must speak up good to you if I know what you say.

"*Q.* You understood me to be asking you—

"*A.* If you know tell me what I am saying. I got father and mother home, that my father was 20 year this country, and that time they both the time home, and he can speak more than I can.

"*Q.* Now your father is sick, isn't he?

"*A.* My father was sick that winter too, last winter.

"*Q.* And he is sick now?

"*A.* Sure, and mother too.    *    *    *

"*Q.* You wasn't there you mean on the 15th?

"*A.* I think I was in the daylight home all time, but I never in the evening."

That this young man's testimony was somewhat of a surprise and disconcerting to defendant's counsel was clearly manifest, but his father, Peter Jackovitz, who defendant also called "Tony," was a witness for the defense. He explained that he had lived in this country for 25 years while his son had come from the old country recently. He then testified in apparently good English that defendant with his wife, child, and Slim were at his house that evening, arriving there about 9 or 9:30 o'clock and leaving there after 10 and his own wife and son were at home at that time. Defendant's counsel took the stand as a witness during the trial for the purpose, as he claimed, of showing that the young man Tony had made a different statement to him as to the time, saying he was not impeaching but disputing him. Objection was made to his testifying and the court sustained the objection. It

is urged that this was reversible error, that defendant's counsel should have been allowed to show, if he could, that the witness Tony had made different statements to him, "not as substantive proof, but as explaining why he had called him, so that the jury should not be prejudiced by his having done so;" citing *People* v. *Payne*, 131 Mich. 474. While the defendant might and did prove facts contradictory to the testimony of his witness Tony, plaintiff's two witnesses who visited defendant's house and testified they obtained the moonshine from him that evening were there but a very short time and both testified he then told them he was just about leaving to go out into the country. It is not disputed that he went, and the only issue is whether he was at home when the boys went there and sold them the liquor, as to which Tony's testimony would apparently cut little figure either way. Aside from the question whether defendant could directly impeach his own witness by showing that he had told a different story before, we think, under the circumstances, there was no emergency which required counsel while trying the case to take the stand as a witness in behalf of his client, and the court was justified in sustaining the objection.

Prejudicial error is also charged against a line of questions asked defendant by the prosecutor on cross-examination as to the location in which he lived and of some of his immediate neighbors having also figured in prosecutions for violating the liquor law, which it is contended was a "studied attempt to prejudice the rights of respondent" before the jury. Defendant's counsel had given the boys who went after moonshine that evening a strenuous cross-examination as to where and by what streets they went to get to defendant's home and the location of buildings in that locality, on the apparent theory that they were mistaken as to the neighborhood in which they claimed to have been.

When defendant took the stand his counsel examined him at length as to the environments of his home and the number of houses near by in contradiction of certain of their testimony. The prosecutor then went over that subject on cross-examination, during which it appeared defendant had two near neighbors named Clark and Bennie Musk. He had testified that the house next to his was empty but later admitted Clark lived there. He was asked if Clark "was the man that was here in court this afternoon that pleaded guilty to a liquor charge," to which he made no reply. The following then took place, upon which prejudicial error is predicated:

"*Q.* The fellow that lives on the corner is Bennie Musk?

"*A.* Yes, sir.

"*Q.* He has been in the liquor business?

"*Mr. W.* I will object to that as immaterial.

"*Q.* I will withdraw the question. I will ask another, don't answer. Bennie Musk has a case in the Supreme Court on a liquor charge?

"*Mr. W.* Objected to as incompetent, irrelevant and immaterial.

"*The Court:* You may answer if you know.

"*Q.* Bennie Musk went your bond, didn't he?

"*A.* Yes, sir.

"*Q.* Bennie Musk is the one that got Mr. W. to defend you?

"*Mr. W.* We will concede he did.

"*Q.* Bennie Musk is the one that went your bond and got Mr. W. to defend you?

"*A.* Well, I employed him myself.

"*Q.* And he was the one that made arrangements for you?

"*Mr. W.* No, he did not.

"*A.* Yes, sir."

This is a case in which it was clearly manifest that certain witnesses on one side or the other were intentionally testifying falsely. Somewhat lengthy and severe cross-examinations were permitted and in-

dulged in by both sides.     The question as to Bennie Musk figuring in the annals of this court was unwise and perhaps objectionable, but was not insisted on or answered.     In connection with Bennie Musk's admitted activities in behalf of defendant, who had admitted to previously being convicted of violating the liquor law, we are not prepared to say the bare asking of the question on cross-examination was, under the circumstances, reversible error.     The scope of cross-examination during the progress of trials with issues such as arose here is necessarily largely in the discretion of the trial court.     In denying defendant's motion for a new trial the court said of this feature of the trial:

"The question arose as to the locality of the houses in the vicinity where Jones lived, one of which was occupied by Bennie Musk.     Another house in the vicinity was occupied by George Clark, and reference made to that.     There was a dispute regarding the number of houses standing in a row on that street and many questions were asked relating to that matter in order to clear up the situation."

The various other errors alleged have not been overlooked, but are not found to involve questions calling for serious discussion.

We find no prejudicial error demanding reversal, and the conviction will stand affirmed.

BIRD, C. J., and SHARPE, SNOW, FELLOWS, WIEST, CLARK, and McDONALD, JJ., concurred.